Richard A. Kamprath (admitted *pro hac vice*)
rkamprath@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1200
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Nancy Olson (SBN 260303)
nolson@olsonstein.com
David Stein (SBN 198256)
dstein@olsonstein.com
**OLSON STEIN LLP**
240 Nice Lane, #301
Newport Beach, CA 92663
Telephone: (310) 916-7433

*Additional Counsel in signature block
Attorneys for Defendants and Counterclaim Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| DOLBY LABORATORIES, INC.; DOLBY LABORATORIES LICENSING CORP.; AND DOLBY INTERNATIONAL, <br><br> Plaintiffs, <br><br> v. <br><br> INTERDIGITAL, INC. AND INTERDIGITAL MADISON PATENT HOLDINGS, SAS, <br><br> Defendants. | **Case No. 2:26-cv-02269-WLH-BFM** <br><br> **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS AND STRIKE UNDER FED. R. CIV. P. 12(b)(6) AND 12(f)** <br><br> Judge: Hon. Wesley L. Hsu <br> Courtroom: 9B <br> Hearing Date: September 4, 2026 <br> Hearing Time: 1:30 p.m. <br> AI Certification in Declaration |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.   LEGAL STANDARD ..........................................................................2

    A.    Rule 12(b)(6) Motion to Dismiss ...........................................2

    B.    Patent Eligibility Under 35 U.S.C. § 101 ...............................3

III.  ARGUMENT ......................................................................................4

    A.    The '268 Patent Claims Are Directed to Patent-Eligible Subject Matter.............................................................................4

        1.    *Alice* Step One – The Claims Are Directed to Methods for Improving Efficiency and Accuracy of Color Correction and Content Distribution.......................................................4

        2.    *Alice* Step Two – The Claims Include Limiting Inventive Concepts. ..............................................................12

        3.    Dolby's Arguments Also Fail Because It Has Not Shown That Claim 6 Is Representative of the Other Challenged Claims. ...................................................14

    B.    At a Minimum, Factual Disputes Preclude Dismissal at *Alice* Step Two.................................................................15

    C.    InterDigital's Second Counterclaim Properly Pleads Direct Infringement by Disney as a Necessary Element of This Case, and Dismissing It Would Be a Due Process Violation. ...........15

IV.   CONCLUSION .................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Streaming Inc. v. Netflix, Inc.*,
  836 F. App'x 900 (Fed. Cir. 2020) ....................................................................7, 8

*Adasa Inc. v. Avery Dennison Corp.*,
  55 F.4th 900 (Fed. Cir. 2022) .............................................................................7

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016) .........................................................................11

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014)..................................................................................... *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016) .........................................................................13

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964)..........................................................................................19

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ....................................................................13, 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................2

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ............................................................ 4, 13, 15

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
  113 F.4th 1359 (Fed. Cir. 2024) .......................................................................14

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019) ..........................................................................3

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  859 F.3d 1352 (Fed. Cir. 2017) ........................................................................14

*Coop. Entm't, Inc. v. Kollective Tech., Inc.*,
  50 F.4th 127 (Fed. Cir. 2022) ..........................................................................15

iii

*Dolby Labs., Inc. v. InterDigital, Inc.*,
  No. CV 26-2270 PA, 2026 WL 1999589 (C.D. Cal. July 7, 2026)..............17, 19

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ......................................................................4

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ...................................................................3, 7

*Genetic Techs. Ltd. v. Merial L.L.C.*,
  818 F.3d 1369 (Fed. Cir. 2016) .....................................................................3

*Glenayre Elecs., Inc. v. Jackson*,
  443 F.3d 851 (Fed. Cir. 2006) ......................................................................19

*GoTV Streaming, LLC v. Netflix, Inc.*,
  166 F.4th 1053 (Fed. Cir. 2026) ...................................................................13

*Hawk Technology Systems, LLC v. Castle Retail, LLC*,
  60 F.4th 1349 (Fed. Cir. 2023) ......................................................................8

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)...................................19

*InterDigital v. Disney*,
  2:25-cv-895, ECF 213 (C.D. Cal. June 10, 2026) .............................................16

*In re Killian*,
  45 F.4th 1373 (Fed. Cir. 2022) .................................................................4, 12

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
  572 U.S. 915 (2014)......................................................................................17

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .....................................................................18

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) .........................................................................2

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) ............................................... 3, 7, 9, 10

*Mitek Systems, Inc. v. USAA*,
  139 F.4th 1340 (Fed. Cir. 2025) ...................................................................19

iv

*Mobile Acuity Ltd. v. Blippar Ltd.*,
 110 F.4th 1280 (Fed. Cir. 2024) ...................................................................15

*Near Field Elecs. LLC v. Enter. Holdings, Inc.*,
 4:25cv-665-RWS, ECF 143 (E.D. Tex. July 31, 2026).....................................18

*Samsung Elecs. Co., Ltd. v. Tech. Consumer Products, Inc.*,
 No. 1:23-CV-186, 2024 WL 1961320 (D. Del. May 2, 2024) ...........................18

*TecSec, Inc. v. Adobe Inc.*,
 978 F.3d 1278 (Fed. Cir. 2020) ........................................................................3

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
 874 F.3d 1329 (Fed. Cir. 2017) .......................................................................13

**Statutes**

35 U.S.C. § 101 ................................................................................ *passim*

35 U.S.C. § 102 ...............................................................................................11

35 U.S.C. § 103 ...............................................................................................11

35 U.S.C. § 284 ...............................................................................................19

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)......................................................................................2

Fed. R. Civ. P. 13 ............................................................................................20

Fed. R. Civ. P. 26(f) ........................................................................................20

| Table of Exhibits | |
|---|---|
| Ex. 1 | Serial No. 14/663,281, Dolby Resp. to Office Action (July 1, 2016) |
| Ex. 2 | Parties Post-Meet and Confer Email Chain June 29 – July 9, 2026 |
| Ex. 3 | Illustrative Decision Tree Showing Impact of Disney Colorist Decisions on Infringement Analysis of '268 Patent |

DEFS.' OPP. TO PLS.' MOT. TO DISMISS                    Case No. 2:26-cv-02269 WLH(BFM)

## I.    INTRODUCTION

Dolby's motion asks the Court to dismiss or strike InterDigital's counterclaims on two disputed grounds. Neither has merit.

***First***, Dolby has failed to carry its heavy burden of establishing that the asserted claims of the '268 Patent—which relate to methods for color correction—are invalid under 35 U.S.C. § 101. Dolby's motion fails at both steps of the *Alice* framework.

At ***step one***, Dolby strips away the claimed invention's technical context and reduces it to the abstract idea of "converting picture content from one format to another." ECF 55 (Dolby Mot. to Dismiss "Mot.") 7. But Claim 6 addresses a specific problem in color-display technology. Movie studios traditionally created one master version of a movie using the color range of a professional monitor. Consumer screens (e.g., a TV, a phone, or a computer—all of varying brands and capabilities) use many different color ranges. In effect, each consumer screen had to reproduce the studio's picture using its own color palette—even when that palette lacked some of the original colors. The result was that colors would appear incorrectly and inconsistently on consumer screens (e.g., wrong shades of black or blues that looked green) or not at all.

Claim 6 solves this color-display mismatch by creating two related master versions of the content. It creates a first master for a non-reference (e.g., consumer) display and then applies the claimed color mapping to create a second master for a reference (e.g., studio) display. Linking the two masters keeps their colors consistent, allows the colors to be displayed by both types of screens, and avoids color-correcting the second master from scratch. That is a concrete improvement in the accuracy and efficiency of video color correction and mastering—not abstract format conversion— and is the type of technological improvement the Federal Circuit has repeatedly held patent eligible.

At ***step two***, Dolby improperly chops the '268 Patent's claims into individual elements of color correction, mastering, and color gamut mapping and argues the claims are nothing more than a combination of known, conventional elements. But Dolby

1

again ignores the inventive concept Claim 6 *actually recites*—the creation of two related master versions to solve the existing color-mismatch problem. At a minimum, whether the '268 Patent's new mastering method was truly inventive *raises factual questions* that cannot be resolved against InterDigital on a motion to dismiss, where InterDigital's well-pleaded factual allegations must be accepted as true and all reasonable inferences must be drawn in its favor.

Dolby has also failed to show that Claim 6 is representative of the other challenged claims of the '268 Patent that Dolby failed to analyze. These other claims recite materially different architectures—including Claim 1's metadata-driven approach—that require an independent eligibility analysis.

***Second,*** Dolby's challenge to InterDigital's Second Counterclaim fares no better. Despite what Dolby alleges, this counterclaim does not seek relief against Disney or seek to add Disney as a party. Rather, it asserts that Disney's direct infringement is a necessary predicate to the indirect-infringement counterclaims against Dolby—the very same issues Dolby raised by filing this action and that Dolby relied on to establish declaratory judgment jurisdiction. Because liability for indirect infringement requires underlying direct infringement (here performance of the claimed methods by, for example, Disney employees), due process requires that InterDigital be permitted to plead and prove Disney's underlying acts of direct infringement.

The Court should therefore deny Dolby's motion as to InterDigital's First and Second Counterclaims.

## II. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the pleading, which must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul*

2

*Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Although patent eligibility under § 101 may be resolved at the pleading stage, *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016), the movant bears the burden of establishing ineligibility by clear and convincing evidence, and factual allegations supporting eligibility must be accepted as true, *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318–19 (Fed. Cir. 2019).

### B.    Patent Eligibility Under 35 U.S.C. § 101

Whether a patent claim recites patent-eligible subject matter under § 101 involves a two-step analysis under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

***Alice Step One***. At step one, the court determines whether the claims are "directed to a patent-ineligible concept," like an "abstract idea." *Id.* at 218. Courts ask "what the patent asserts to be the focus of the claimed advance over the prior art" by considering the asserted claims "in light of the specification." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020). At step one, courts must avoid describing the claims at "a high level of abstraction and untethered from the language of the claims" because doing so "all but ensures that the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). Instead, courts examine whether the challenged claims "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).

The Federal Circuit has consistently held claims eligible when they recite a specific technical process that improves the underlying technology. *See, e.g.*, *id.* (claims patent-eligible where "the incorporation of the claimed rules, not the use of the computer," improved synchronized 3D facial animation by automating tasks previously performed by humans through a "distinct process" rather than merely automating the same prior method); *Enfish*, 822 F.3d at 1336–39 (claims not abstract where directed to

3

self-referential database table that improved computer data storage).

In contrast, courts have found claims ineligible when they use computers merely as tools to perform abstract economic or mental tasks, or generic data processing. *See, e.g.*, *Alice*, 573 U.S. at 218–21 (claims ineligible where directed to intermediated settlement—"a fundamental economic practice"—using generic computer to implement escrow); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353–54 (Fed. Cir. 2016) (claims ineligible that recited only "collecting," "analyzing," and "displaying" data from power grid); *In re Killian*, 45 F.4th 1373, 1379 (Fed. Cir. 2022) (claims abstract that recited method for "identifying people who may be eligible for SSDI benefits").

*Alice Step Two*. If a patent claim fails at step one, the court proceeds to step two, where it "examine[s] the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221. "The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (internal quotation marks omitted). "[W]hether a claim element or combination of elements is well-understood, routine, and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Id.* at 1368.

## III.  ARGUMENT

### A.    The '268 Patent Claims Are Directed to Patent-Eligible Subject Matter.

#### 1.    *Alice* Step One – The Claims Are Directed to Methods for Improving Efficiency and Accuracy of Color Correction and Content Distribution.

##### a.    *Technical Problem: Varying Consumer Screens Displayed the Wrong Colors.*

The '268 Patent improves how video studios prepare content for viewing on

different types of screens (e.g., TV, phone, computer), all of which can be different brands with varying capabilities. It is directed to "methods and systems for color correcting to provide predictable results on displays with different color gamuts." '268 Patent at 1:11–14, 4:38–40, 6:3–5. When a studio finishes a movie, it adjusts the video's colors on a professional monitor to achieve the intended appearance—a process called "color correction." *Id.* at 8:11–14. Consumers, however, watch the movie on a variety of devices. *Id.* at 1:60–2:1. Each of these devices has its own "color gamut"—the range, or palette, of colors it can display. *Id.* at 2:7–31. And the differences in the color ranges can be "significant." *Id.* at 1:60–2:1, 2:50–55.

These differences created a problem for the conventional mastering process. Before the '268 Patent, studios generally prepared one finished version of a movie called a "master." That master was created solely for the color range of the studio's professional reference monitor, which often differed from the color ranges of consumer screens. *Id.* at 1:15–25. If the master version called for a color that a consumer screen could not produce, the screen substituted a different color. *Id.* at 1:31–44, 3:7–10, 4:7–11. Put simply, each consumer screen was being asked to paint the picture of the studio master without necessarily having the same color palette—the results were often wrong (if the color could be displayed at all) and resulted in inconsistent image reproduction across consumer displays. *Id*. For example, "fir trees look like pine trees, tomatoes look like oranges, and so forth." *Id.* at 3:9–10.

Creating a separate master from scratch for every possible consumer display was not a workable solution to this problem. With many different displays and color ranges in use, that approach would require studios to create numerous independent versions of the same movie. *See id.* at 1:60–2:1, 2:50–55. Studios needed a way to prepare versions for different color-display ranges without independently repeating the entire mastering process for each one.

### b.    *Technical Solution: Create Related Masters for Consistent Color Display.*

Claim 6 teaches studios how to solve this color-mismatch problem by following

5

the new technique of creating *two* related masters. First, the claim discloses that the source video must be mastered for consumer displays "having a non-reference color gamut." The studio must then create the master for the professional "reference type displays having a reference color gamut," not independently from scratch, but "using a color gamut mapping applied to" the first master version. *Id.* at cl. 6, 4:56–5:4. In simple terms, the claimed color mapping teaches using the colors selected for the first (consumer) display's color palette to guide creation of the version for the second palette (i.e., that used by the reference display). Thus, the first master guides creation of the second, keeping the colors consistent between them.

Linking the *two* master versions in this way provides a "real benefit": the master now contains no color that cannot be displayed by either the consumer display or the studio's reference display. *See id.* at 10:1–12. Each version contains colors that its corresponding display can produce. Under the claimed method, because the first master guides creation of the second, the second version need not be independently color-corrected from scratch. Claim 6 thus improves both the accuracy and efficiency of preparing video for displays with different color ranges.

Claim 1, which discloses a distinct invention, makes this process even more efficient. It teaches mastering the source video "only" for the consumer displays having the "non-reference color gamut" and "generating metadata for a color gamut mapping" to translate that master's colors to the reference display. *Id.* at cl. 1. Following this improvement, the studio can distribute *one* full master with the metadata to consumers instead of creating and distributing a second full version, while keeping colors consistent for both display types. *See id.* at cls. 1–4, 4:41–55.

### c.     *Dolby Improperly Strips Away the Claims' Technical Context.*

Dolby over-abstracts Claim 6 (and the unanalyzed claims) as being directed to mere data conversion from one format to another, but the Federal Circuit has repeatedly held that claims are patent-eligible at *Alice* step one when they recite a "specific means or method that improves the relevant technology," rather than an abstract idea that

6

"merely invoke[s] generic processes and machinery." *McRO*, 837 F.3d at 1314; *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908–09 (Fed. Cir. 2022) (claims eligible where directed to specific and concrete technological advance in RFID encoding). Claim 6 falls plainly on the "technological improvement" side of the line because it does not recite generic conversion in the abstract. Rather, it recites a specific two-step process for creating related masters. Claim 6 first creates a master for non-reference (e.g., consumer) displays and then creates the master for the reference (e.g., studio) display "using a color gamut mapping applied to" the first master. '268 Patent at cl. 6, 4:56–5:4, 9:56–67. The two masters are therefore not created independently: under the claim, the first guides creation of the second, keeping their colors consistent. That relationship solves the color-display problem described above by allowing colors to be reproduced predictably across screens with different color ranges. *See id.* at 10:1–12. Dolby cannot strip that technical solution from the claim and characterize what remains as abstract "format conversion." *See Enfish*, 822 F.3d at 1337.

The Federal Circuit's decision in *McRO* confirms that the '268 Patent claims asserted here are not abstract. There, the Federal Circuit held the claims patent-eligible because they used specific rules that linked spoken sounds to particular facial movements and timing, allowing a computer to generate synchronized 3D facial animation. The Federal Circuit held those claims patent-eligible because "it is the incorporation of the claimed rules . . . that improved the existing technological process." *McRO*, 837 F.3d at 1314 (internal quotation marks omitted). Claim 6 likewise prescribes specific rules for creating the two related master versions: create the consumer-display (non-reference) master first, then create the studio-display (reference) master using a color mapping applied to the first. '268 Patent at cl. 6, 4:56–5:4.

Dolby's reliance on non-precedential *Adaptive Streaming Inc. v. Netflix, Inc.*, 836 F. App'x 900 (Fed. Cir. 2020), is misplaced. In *Adaptive Streaming*, the claims recited only the generalized idea of "collecting information and transcoding it into

7

multiple formats"—*i.e.*, receiving content in one compression format and outputting it in another—without specifying any technological advance in the coding techniques used to implement that conversion. *Id.* at 903. The court emphasized that the claims failed because they did not recite a "specific advance in coding or other techniques for implementing that idea." *Id.* Claim 6 of the '268 Patent is fundamentally different. It does not merely recite "convert content from Format A to Format B." Rather, it recites a specific ordered mastering workflow: content is first mastered for displays having a non-reference color gamut, and the reference-gamut master is then *derived from* that non-reference master version. '268 Patent at cl. 6. That defined dependency between the two masters provides a specific technological advance by ensuring the master contains no color that cannot be displayed by either type of display, solving the color errors that plagued prior systems. *See id.* at 10:1–12, 1:31–44, 3:1–20, 4:7–41. Unlike the claims in *Adaptive Streaming*, Claim 6 specifies *how* the improvement—correcting the inability of consumer screens to properly display a video's colors—is achieved through the specific, claimed mastering workflow.

*Hawk Technology Systems, LLC v. Castle Retail, LLC*, 60 F.4th 1349 (Fed. Cir. 2023), is no better for Dolby. Mot. 10–11. There the court found claims for a purportedly improved video surveillance system directed to the abstract idea of "storing and displaying video." *Hawk Tech. Sys.,* 60 F.4th at 1356. The Federal Circuit held the claims ineligible because they recited high-level functional results—"receiving video images," "displaying . . . digitized images," "converting . . . the video source images into a selected video format," and "storing" and "transmitting" them, but "fail[ed] to recite a specific solution to make the alleged improvement—conserving bandwidth while preserving quality"—or otherwise explain *how* the claims improved the functionality of video surveillance systems. *Id.* at 1357–58.

Dolby attempts to squeeze Claim 6 into that same mold, but the comparison fails. The claims in *Hawk Technology* merely recited functions such as converting, storing, and transmitting video without explaining *how* those functions achieved the asserted

8

technological improvement in bandwidth and image quality. Claim 6, by contrast, claims the specific two-master process, i.e., "rules," that produce the asserted improvement in color display. *See, e.g.*, *McRO*, 837 F.3d at 1314–16. Claim 6 does not merely claim the improved result of displaying consistent colors across different consumer screens and eliminating color errors. It specifies *how* that result is achieved: by first creating the master for consumer displays having a non-reference color gamut and then creating the reference-display master "using a color gamut mapping applied to" the first master. '268 Patent at cl. 6. As a direct result of this specific process, the specification teaches that "there will be no colors in the master" that cannot be displayed by either type of display. *Id.* at 10:1–12.

### d.      Dolby Has Told the USPTO That Specific Video Color-Grading Improvements Are Patent Eligible.

Dolby's own arguments to the Patent Office when prosecuting the application that issued as U.S. Patent No. 9,532,022 further undermine its position. The '022 Patent claims a method for "color grading video data input on a target display." Ex. 1 (Serial No. 14/663,281, Resp. to Office Action (July 1, 2016)) at 9.  To overcome a § 101 rejection that the claims were directed to the abstract idea of "comparing and manipulating/computing intangible data," Dolby argued that the '022 Patent's claims provided "an improvement in computer capabilities (i.e. a better way of automatically generating color-graded video data)" by, among other things, "[r]educ[ing] the amount of manual adjustments" and "[r]educing the risk of introducing undesirable distortions in the video data" and ultimately were "specifically directed to an improved method for processing input video data to yield color-graded video data for display on a target display." *Id.* at 10–11. Dolby further argued that characterizing the claims as merely "comparing and manipulating/computing intangible data" improperly described them "at such a high level of abstraction untethered from the language of the claims" and that "doing so all but ensure[d] that the exceptions to 35 U.S.C. § 101 swallow the rule." *Id.* at 11. In sum, Dolby argued its claims recited a "new method for color grading input

9

video data for display on a target display" and thus "a specific implementation of a solution to a problem in the software arts." *Id.* at 12.

While the '022 and '268 Patents claim different methods, the bedrock § 101 principle Dolby raised to advocate for the issuance of its own patent applies equally here: a specific video-processing method must be evaluated according to what the claim requires, not reduced to a generic description of data manipulation. But Dolby now commits the same error it warned the USPTO against by reducing Claim 6's two related masters and required color mapping to generic "format conversion." Considered at the proper level of specificity, Claim 6, like Dolby argued to the USPTO, recites a particular solution to a video-processing problem—keeping colors consistent across displays with different color ranges while avoiding independent color correction of each version.

### e.      *Dolby's Remaining Step One Arguments That the Claims Are Merely Limited to a Specific Environment or Known in the Prior Art Also Fail.*

Dolby's contentions that the claims are merely "functional" and the individual elements—color correction, color gamuts, and color gamut mappings—were known in the prior art ignore the guidance of the Supreme Court and Federal Circuit. Mot. 8–9. At *Alice* step one, the relevant question is whether the claims, when viewed as a whole, are "directed to" an abstract idea or, instead, to a specific technological improvement. *See McRO*, 837 F.3d at 1313–14. Here, Claim 6 recites a specific, ordered mastering process as described above.

Dolby's argument that there is no claimed technological solution because the claims do not recite a specific algorithm, transformation formula, or mapping technique misapprehends the level of specificity required by § 101. Mot. 8–9, 13. The step-one analysis does not require that a patent claim recite an algorithm—that would import a § 112 requirement into the § 101 analysis. *See McRO*, 837 F.3d at 1313–14. Claim 6 is directed to patent-eligible subject matter because it claims the specific two-master process described above, not merely the desired result of consistent colors. That process

10

is a concrete improvement in color correction and video mastering.

Dolby's assertion that Claim 6's mention of different display technologies merely describes the "environment in which color correction occurs" mischaracterizes the claims. *See* Mot. 11–12 (citing *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016)). In *Affinity Labs*, the claims recited an abstract content-delivery concept—streaming regional broadcast content to a cellular device— and the "particular existing technological environment" was the cell phone. *Id.* at 1258– 59. The claims did nothing to improve *how* the cell phone functioned. Here, by contrast, the different display technologies are not merely the environment; they are *the very source of the technical problem* the claims solve. Content mastered for only a single color range can produce distorted or un-displayable colors when viewed on consumer displays with different color ranges. '268 Patent at 1:26–44, 3:1–38. Claim 6 solves that problem through its ordered mastering workflow, ensuring consistency across those devices with different color ranges. The display technologies are integral to the claimed improvement—not a passive backdrop.

Dolby's argument that "mastering" was known in the prior art also misses the mark. Mot. 12–13. InterDigital does not dispute that the idea of "mastering"—in the generic sense of creating a final version of content for display—existed before the '268 Patent. The '268 Patent claims a specific two-master process that addresses the color mismatch caused by the old way of mastering. If anything, the references Dolby cites reiterate the known need to adjust color information for "enhanced color rendition on the target display device." U.S. Pat. Appl. No. 2007/0291179 ¶ 14; Mot. 12 (citing the same). But the prior art references Dolby cites do not solve the color-mismatch problem or show that Claim 6's method was known or conventional.[1]

Finally, Dolby's argument that Claim 6 is "broad enough to cover a human

---

[1] Regardless, the comparison of the asserted claims to prior art happens later under 35 U.S.C. §§ 102 (anticipation), 103 (obviousness). Those inquiries require evidence and expert opinions, not mere attorney argument.

11

colorist manually performing color correction" fundamentally mischaracterizes what the claim actually recites. Mot. 13. Claim 6 does not claim the manual creative process of "color correction" to choose aesthetically preferred colors. *See* '268 Patent at 8:11–16. The claimed improvement is not the particular colors a colorist chooses. It is how the two masters are created. '268 Patent at cl. 6, 4:56–5:4, 9:56–67. Because the second master is based on the first, their colors remain predictably related, and the second master need not be created independently from scratch. That a colorist applies this improved method is a red herring.

Dolby's reliance on *In re Killian*, is also misplaced. Mot. 13. *Killian* involved a method for using a computer to identify people in the Social Security database who may be eligible for Social Security disability benefits—a search-and-selection process that could otherwise be performed entirely in the human mind. 45 F.4th at 1379, 1381–84. Claim 6 is not directed to mere mental observation or selection; it recites a specific process for applying a color gamut mapping to mastered picture content to create a related master for a different display type.

### 2.   *Alice* Step Two – The Claims Include Limiting Inventive Concepts.

Even if the Court reaches step two (it need not), Claim 6 supplies an inventive concept through the specific way its steps are ordered and connected. The claim first creates a color-corrected master for consumer (non-reference) displays whose color range differs from the standardized studio (reference) range. It then derives the second master for the studio's reference displays by applying the claimed color mapping to the first, so the two versions are not color-corrected independently. '268 Patent at cl. 6.

This specific ordered process must be considered as a whole. Dolby argues that "color correction," "mastering," and "color gamut mapping" were individually conventional, but it never addresses the combination Claim 6 recites: creating the non-reference display master first and using it to create the reference display master through the claimed mapping. Mot. 14–16. Step two does not ask only whether each individual

12

element was known. It asks whether the claim elements, "individually and as an ordered combination," transform the nature of the claim and go beyond what was "well-understood, routine, [and] conventional." Claim 6 does that. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1347–48 (Fed. Cir. 2016); *see Berkheimer*, 881 F.3d at 1367. And Dolby offers no evidence—*much less clear and convincing evidence*—that this particular two-master process was well-understood, routine, and conventional as a matter of undisputed fact prior to the '268 Patent. *See Berkheimer*, 881 F.3d at 1368.

*BASCOM* and *Amdocs* confirm that even known components may supply an inventive concept when combined in a new way. In *BASCOM*, the individual filtering components were known, but their "non-conventional and non-generic arrangement" was inventive. 827 F.3d at 1349–51. *Amdocs* reached the same conclusion for a particularly arranged distributed architecture of known data-processing elements. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300–02 (Fed. Cir. 2016). The same reasoning applies here. Claim 6 does not claim color correction or color mapping in isolation; it claims a particular arrangement in which the first master guides creation of the second. At a minimum, whether that arrangement was conventional presents a factual dispute that cannot be resolved against InterDigital on a motion to dismiss. *See Berkheimer*, 881 F.3d at 1368.

Dolby's reliance on *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337–39 (Fed. Cir. 2017) and *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1064–65 (Fed. Cir. 2026) is also misplaced. Mot. 15–16. Both cases, again, involved claims that recited desired results in functional language without explaining *how* those results were technologically achieved. Claim 6, by contrast, specifies *how* the improved mastering is achieved: the reference master is created from the non-reference master through the claimed color gamut mapping. That ordered arrangement is a specific implementation—not a result untethered from how it is achieved—and may supply an inventive concept even if its individual elements were

13

known. *See BASCOM*, 827 F.3d at 1349–51. Dolby's challenge thus also fails step two.

### 3. Dolby's Arguments Also Fail Because It Has Not Shown That Claim 6 Is Representative of the Other Challenged Claims.

Dolby has not carried its burden to show Claim 6 is representative of the other challenged claims, especially Claim 1. To treat one claim as representative, a movant must demonstrate that all claims are "substantially similar and linked to the same" allegedly abstract idea. *See Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017). The question for representativeness is not whether other limitations are themselves inventive, but whether they are material enough to warrant independent analysis—and they plainly are.

Dolby dismisses independent Claim 1's "generating metadata for a color gamut mapping" limitation as merely substituting "a generic 'metadata' limitation" for Claim 6's second "mastering" step. Mot. 16. But Claim 1 recites a different method entirely. Claim 6 creates *two* related masters; but Claim 1 creates "only" the non-reference master and generates metadata instructions for translating the master's colors for view on the reference display. '268 Patent at cl. 1, 4:41–55, 8:42–9:27. Claim 1 therefore avoids creating and distributing a second full master. And unlike the metadata in *Broadband iTV, Inc. v. Amazon.com, Inc.*, which merely "organiz[ed] the display of video content," Claim 1's metadata performs a specific color-correction function by enabling colors to be translated between different display ranges. Mot. 16 (quoting *Broadband iTV, Inc.*, 113 F.4th 1359, 1368 (Fed. Cir. 2024)). That is a different technological solution requiring its own eligibility analysis.

The dependent claims likewise contain material limitations that Dolby ignores. Claim 2 addresses whether the metadata is provided to reference displays in-band or out-of-band with the mastered content. Claim 3 requires using the metadata to perform the color gamut mapping and verify the color-correction result on a reference display. Claim 4 requires applying the mapping during color correction and subsequent consumer use. '268 Patent at cls. 2–4. Claim 8 reconstructs the reference gamut on a

14

consumer device "using metadata and the mastered color corrected picture content for display on the non-reference type displays." *Id.* at cl. 8. Claim 9 adds a distinct processing method of simulation-based color gamut mapping for the non-reference display on the reference display. *Id.* at cl. 9. These are "non-frivolous" differences that preclude representative treatment. *See Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1290–92 (Fed. Cir. 2024). Dolby's conclusory assertion that these claims merely "sound technological" without specifying implementation detail is incorrect and improperly applies a step-two conventionality analysis to the representativeness question. Mot. 17.

**B.    At a Minimum, Factual Disputes Preclude Dismissal at *Alice* Step Two.**

A § 101 motion to dismiss may be granted only if, after drawing all reasonable inferences in InterDigital's favor, ***no plausible factual dispute remains***. *See Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022). Whether the claimed combinations were "well-understood, routine, [and] conventional" is a factual question requiring *clear and convincing evidence*. *Berkheimer*, 881 F.3d at 1368. Here, the specification describes that the '268 Patent's claimed mastering process was non-routine and produced concrete technological improvements. *See* '268 Patent at 4:41–5:4, 8:42–9:67, 10:1–12, 11:30–41. InterDigital's Counterclaims and the specification thus raise plausible factual disputes regarding whether the '268 Patent's claims introduce an inventive concept. Dolby cannot show otherwise and therefore has not met its burden at the initial pleading stage.

**C.    InterDigital's Second Counterclaim Properly Pleads Direct Infringement by Disney as a Necessary Element of This Case, and Dismissing It Would Be a Due Process Violation.**

Dolby—based on its pleading—is the true "defendant" in this case. It chose to step into Disney's shoes and defend Disney's direct infringement of the '268 Patent. Dolby promised this case would essentially pick up where the Disney Action left off, representing to InterDigital and the Court that it "will not challenge the Court's existing

15

claim constructions, will limit discovery, and will prepare for trial as soon as possible." ECF 33 (Pls.' Opp. to Defs.' Mot. to Dismiss) at 2–3, 18.

Disney, for its part, agreed to be bound by the outcome:

> **DISNEY'S COUNSEL:** "[W]e've essentially agreed to be bound by whatever happens in the Dolby case. So we don't need to be a party of it."

ECF 53 (Defs.' Answer and Counterclaims) ¶ 92 (quoting Tr. at 15:4–9).

The Court confirmed this on the record:

> **THE COURT:** "It's your client that's agreeing to be bound by what happens in Dolby, right? Not just you [counsel]?"
>
> **DISNEY'S COUNSEL:** "That's correct. It's my client."

*Id.* (quoting Tr. at 15:22–25). Based on these representations, the Court denied InterDigital's motion to dismiss Dolby's declaratory judgment complaint and stayed the Disney Action, reasoning that "resolving the Dolby Action prior to the instant lawsuit will also shield Disney from unnecessary costs and labor." *See InterDigital v. Disney*, 2:25-cv-895, ECF 213 at 10 (C.D. Cal. June 10, 2026).

Dolby has now done a complete about-face. Having secured the stay it wanted, Dolby now seeks to erase Disney from this case entirely and prevent InterDigital from pleading the very direct infringement that Dolby told the Court would be adjudicated here. This was never what the parties discussed or what the Court envisioned when it stayed the Disney Action. Dolby's positions to secure declaratory judgment jurisdiction and its positions now in opposing InterDigital's counterclaims amount to a wholesale bait and switch:

| Dolby's Opposition to InterDigital's Motion to Dismiss (ECF 33) | Dolby's Motion to Dismiss InterDigital's Counterclaims (ECF 55) |
| --- | --- |
| Furthermore, if Dolby were to fail in its declaratory-judgment action and InterDigital is awarded damages, **InterDigital will be fully** | **InterDigital cannot recover damages from Dolby for Disney's conduct** because Disney is a nonparty and an unrelated entity. Dolby's indemnity |

16

| | |
|---|---|
| **compensated and cannot seek damages for Dolby's customers' use of the same products.** ECF 33 at 17. | obligations would not entitle InterDigital to "the full extent of damages resulting from Disney's directly infringing conduct," as InterDigital claims. ECF 55 at 18–19.<br><br>"We are litigating Dolby Vision's infringement. . . . Dolby will litigate its own damages (if any) and not the damages of its customer, including Disney." Ex. 2 (07/09/26 Email).[2] |
| **Dolby will not challenge the Court's existing claim constructions, <u>will limit discovery</u>**, and will proceed to trial on an expedited schedule. ECF 33 at 18. | **Written Discovery:** Based on its view of case scope, **_Dolby_** proposes serving . . . :<br>• Interrogatories: **25 per side** _[22 served to date]_<br>• Requests for production: **no limit** _[79 served to date]_<br>• Requests for admission: **100 per side.**<br>• Depositions: 12 per side<br><br>ECF 59 (26(f) Report) at 13–14. |

Disney's direct infringement must be adjudicated in this case because it is an element of the indirect infringement counterclaim against Dolby, and the Court stayed the Disney case in favor of resolving the question here. Under controlling precedent, "where there has been no direct infringement, there can be no inducement of infringement under § 271(b)." _Limelight Networks, Inc. v. Akamai Techs., Inc._, 572 U.S. 915, 922 (2014). Indirect infringement means Dolby induced or contributed to Disney's direct infringement. An indirect-infringement claim cannot exist without underlying

---

[2] This is contrary to Dolby's acknowledgement that software cannot directly infringe method claims, ECF 33 at 11 (pursuing only indirect infringement theory), and contrary to customer-suit exception cases in which courts do not apply the exception unless the manufacturer case will fully resolve liability.

direct infringement. Dolby itself told this Court that InterDigital's claim charts against Disney "establish an implicit allegation of inducement *or* contributory infringement." ECF 33 at 9 (emphasis in original). And the Court relied on that representation in denying InterDigital's motion to dismiss. ECF 44 at 5–7. Having invoked indirect infringement as the basis for its declaratory judgment claims, Dolby cannot now backtrack and argue that InterDigital cannot plead the predicate element of Disney's direct infringement.

Disney is also the logical and necessary direct infringer for adjudicating Dolby's indirect infringement. Software standing alone cannot directly infringe a method patent claim. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009). Dolby Vision is software. To prove infringement of the asserted method claims of the '268 Patent, InterDigital must show that an actor (*i.e.*, Disney) practices every step of the claimed method. ECF 53 ¶ 72. Thus, direct infringement turns on how Disney uniquely uses Dolby's software. *See* Ex. 3 (illustrative decision tree showing that user choice matters to infringement of asserted method claims, the software cannot be analyzed in a vacuum). There is no declaratory judgment jurisdiction over Dolby as a direct infringer; the Dolby controversy identified by the Court's Order concerns indirect infringement only. ECF 44 at 5–7. Moreover, discovery regarding Disney's direct infringement is substantially complete from the stayed Disney Action, which the Court stayed because this case was supposed to resolve the same issues more efficiently.

There is also a practical reason why direct infringement must be pleaded as its own counterclaim and not merely included as a sub-element under Dolby's indirect infringement. A jury could find that Dolby does not indirectly infringe—for example, if the *mens rea* element of inducement is not satisfied—and leave Disney's direct infringement unresolved. *See Samsung Elecs. Co., Ltd. v. Tech. Consumer Products, Inc.*, No. 1:23-CV-186, 2024 WL 1961320, at *2 n.2 (D. Del. May 2, 2024) (denying customer-suit stay where manufacturer's "lack[ing] the appropriate *mens rea*" could leave direct infringement against reseller unresolved); *see also Near Field Elecs. LLC*

18

*v. Enter. Holdings, Inc.*, 4:25-cv-665-RWS, ECF 143 at 5–8 (E.D. Tex. July 31, 2026) (denying customer-suit stay where customers and not manufacturer were accused of infringing method claims). This is the empty chair problem InterDigital identified in its motion to dismiss. ECF 27 at 21:1-6. InterDigital would then lose a year of litigation and still face the same direct infringement question in the stayed Disney Action. That result serves no one. A proper customer-suit resolution requires findings on both direct and indirect liability.

Indeed, in dismissing Dolby's second declaratory judgment action, Judge Anderson noted that Dolby could have intervened to protect its customers rather than pursuing a wholesale "do over," and the Federal Circuit in *Mitek Systems, Inc. v. USAA*, 139 F.4th 1340, 1355 (Fed. Cir. 2025), affirmed that intervention is the superior procedural mechanism for a supplier seeking to protect its interests in customer infringement suits. *Dolby Labs., Inc. v. InterDigital, Inc.,* No. CV 26-2270 PA (SPx), 2026 WL 1999589, at *3 (C.D. Cal. July 7, 2026). Denying InterDigital the ability to obtain an independent finding on Disney's direct infringement—when that formed the basis for InterDigital's assertion of its patent rights and all parties agreed this case would resolve that question—would violate InterDigital's due process rights.

Dolby's argument that InterDigital improperly seeks damages from Dolby for Disney's conduct misunderstands the law of indirect infringement damages. Mot. 18–20. An indirect infringer is "a species of joint-tortfeasor, who is held liable because he has contributed with another to the causing of a single harm to the plaintiff." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 500 (1964). Section 271(b) provides that an inducer "shall be liable as an infringer"—not as some lesser category of wrongdoer—and 35 U.S.C. § 284 draws no distinction between direct and indirect infringers in measuring damages. *See Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 859 (Fed. Cir. 2006) (indirect infringer liable for "damages that would be assessed had the patentee sued and obtained a judgment against the customers"); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852–56 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)

19

(affirming $200 million damages award against inducer, based on end users' infringing use of the patented method). InterDigital is not seeking damages from Disney. It is seeking damages from Dolby based on Dolby's own liability as an inducer, measured by Disney's direct infringement that Dolby caused.

Dolby's indemnity argument also misses the point. Mot. 18–19. InterDigital's Second Counterclaim does not rely on the indemnity agreement as a source of liability. It relies on the fact that Dolby placed indirect infringement at issue and represented to this Court that it "has accepted its contractual indemnity obligation to Disney according to the contractual terms." ECF 33 at 14. Dolby cannot simultaneously tell the Court it will defend Disney's direct infringement and then argue that InterDigital is prohibited from pleading that same direct infringement defended by Dolby.

Finally, Dolby's Rule 13 argument—that the Second Counterclaim is improper because Disney is not an "opposing party"—fails. Mot. 20–21. InterDigital is not filing a counterclaim "against" Disney within the meaning of Rule 13. It is pleading direct infringement by Disney as an element of the inducement claim that Dolby itself put at issue. The purpose of the Second Counterclaim is to ensure that this Court adjudicates direct infringement as a predicate to the indirect infringement claims, consistent with Disney's agreement to be bound.[3] Dolby's motion to strike should be denied.

## IV.   CONCLUSION

For the foregoing reasons, Dolby's motion to dismiss and strike should be denied. Dolby has not shown that any challenged claim of the '268 Patent is ineligible under § 101, and at a minimum, fact issues at *Alice* step two preclude dismissal. InterDigital's

---

[3] InterDigital understands the scope of this case concerns direct infringement by Disney as defended by Dolby under Dolby's indirect infringement theory for which the Court found subject matter jurisdiction. *See* ECF 59 at 2-4 (Joint Rule 26(f) report summarizing case scope dispute). InterDigital does not believe there is a basis for expanding the case beyond that, but, if the case expands to cover every Dolby customer, and each of their individual uses of Dolby Vision, then InterDigital respectfully submits that the basis for jurisdiction and how to manage discovery for hundreds of customers would need to be addressed for case management purposes.

Second Counterclaim properly pleads direct infringement as a necessary predicate to the indirect infringement claims Dolby itself placed at issue.

21

Dated: August 7, 2026                 Respectfully submitted,

                                      /s/ Richard A. Kamprath
                                      Richard A. Kamprath *(admitted pro hac vice)*
                                      rkamprath@mckoolsmith.com
                                      **MCKOOL SMITH, P.C.**
                                      300 Crescent Court, Suite 1200
                                      Dallas, Texas 75201
                                      Telephone: (214) 978-4000
                                      Facsimile: (214) 978-4044

                                      Joshua W. Budwin *(admitted pro hac vice)*
                                      jbudwin@mckoolsmith.com
                                      **MCKOOL SMITH, P.C.**
                                      303 Colorado Street, Suite 2100
                                      Austin, Texas 78701
                                      Telephone: (512) 692-8700
                                      Facsimile: (512) 692-8744

                                      Nancy Olson (SBN 260303)
                                      nolson@olsonstein.com
                                      David Stein (SBN 198256)
                                      dstein@olsonstein.com
                                      **OLSON STEIN LLP**
                                      240 Nice Lane, #301
                                      Newport Beach, CA 92663
                                      Telephone: (310) 916-7433

                                      **Attorneys for Defendants and
                                      Counterclaim Plaintiffs**

22

## **L.R. 11–6.2 Certification**

The undersigned, counsel of record for Defendants and Counterclaim Plaintiffs, certifies that this brief contains 6,992 words, which complies with the word limit of L.R. 11-6.1, and likewise complies with the word limit set by Court Order dated February 6, 2025. *See* ECF 21 (WLH Standing Order for Newly Assigned Civil Cases) § G.4 (motion not to exceed 7,000 words).

Dated: August 7, 2026            */s/ Richard A. Kamprath*
                                      Richard A. Kamprath

23