UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DOLBY LABORATORIES, INC., DOLBY LABORATORIES LICENSING CORP., AND DOLBY INTERNATIONAL AB,

Plaintiffs,

v.

INTERDIGITAL, INC. AND INTERDIGITAL MADISON PATENT HOLDINGS, SAS,

Defendant.

Case No. 2:26-cv-02269-WLH-BFM

**ORDER RE PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS [55], DEFENDANTS' APPLICATIONS TO FILE UNDER SEAL [81, 88], AND PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE [95]**

The Court is in receipt of Plaintiffs Dolby Laboratories, Inc., Dolby Laboratories Licensing Corporation, and Dolby International AB (collectively, "Dolby") Motion to Dismiss Defendants InterDigital Madison Patent Holdings, SAS and InterDigital, Inc.'s (collectively, "InterDigital") conditional counterclaims and strike InterDigital's requested relief as to nonparty Disney, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f), respectively (the "Motion"). (Mot., Dkt. No. 55). The Court is also in receipt of InterDigital's related Applications to File Under Seal, ("Application to File Ex. 2 Under Seal," Dkt. No. 81; "Application to File Exhibit B Under Seal," Dkt. No. 88; collectively, "InterDigital's Applications to File

Under Seal"), and Dolby's Request for Judicial Notice ("RJN," Dkt. No. 95). For the reasons explained herein, the Court **DENIES** the Motion as to Dolby's patent eligibility arguments, **GRANTS** the Motion as to InterDigital's Second and Third Counterclaims, **DENIES** InterDigital's Applications to File Under Seal, and **DENIES** Dolby's RJN.

## I. BACKGROUND

On March 3, 2026, Dolby filed this declaratory judgment action pursuant to the Declaratory Judgment Act. (*See* Compl., Dkt. No. 1). Dolby specifically seeks a declaratory judgment of noninfringement and invalidity of U.S. Patent No. 9,185,268 (the "'268 Patent"). (*Id.*). This action (the "Dolby Action") arises out of what Dolby characterizes as intentional targeting by InterDigital by suing "Dolby's downstream customer The Walt Disney Company ("Disney") and related Disney entities in this District" and "accus[ing] them of infringing the ['268] Patent by virtue of their alleged use of Dolby's product, Dolby Vision, in creating content for various streaming products such as Disney+ and Hulu." (*Id.* ¶ 3). The primary vehicle of such targeting as alleged by Dolby is a separate action before this Court, *InterDigital, Inc. et al. v. The Walt Disney Company et al.*, No. 2:25-CV-00895-WLH-BFM (C.D. Cal.) (the "Disney Action"). (*Id.*).

Dolby asserts that InterDigital's infringement allegations related to the '268 Patent in the Disney Action are directed solely at Dolby Vision, a high dynamic range ("HDR") video technology developed and owned by Dolby Laboratories. (Compl. ¶ 21, 24). Third parties utilize Dolby Vision in their products and services through licensing agreements in accordance with Dolby's specifications. (*Id.* ¶ 21). InterDigital's complaint in the Disney Action attaches a claim chart for the '268 Patent that, according to Dolby, "squarely and expressly targets Dolby's 'Dolby Vision workflow,'" and accuses Disney of infringement of the '268 Patent "solely by virtue of Disney's incorporation and use of Dolby Vision" in Disney+, Hulu and Hulu Live, among others. (*Id.* ¶ 23). Dolby cites to the fact that "InterDigital does not

allege in its complaint or claim chart that Disney uses Dolby Vision in any manner outside Dolby's specifications or licensing instructions, but instead attributes the alleged infringement of the '268 Patent solely to the use of Dolby Vision as provided by Dolby." (*Id.* ¶ 24). Dolby has alleged it has contractual indemnity obligations to Disney regarding Disney's use of Dolby Vision with which it will comply. (*Id.* ¶ 25; *see* Dkt. 33 at 12-14).

On May 1, 2026, Disney moved to stay the Disney Action, agreeing to be "bound by the outcome of the Dolby Action with respect to infringement and validity of the '268 Patent if this case is stayed." (Disney Action, Motion to Stay Case, Dkt. No. 177). Accordingly, on June 10, 2026, the Court stayed the Disney Action (which by then, had been narrowed to only include claims arising from the '268 Patent), pursuant to the customer-suit exception and Disney's agreement to be bound by the outcome of the Dolby Action. (Disney Action, Order RE Defendants' Motion to Stay Pending Resolution of Related Proceedings, Dkt. 213).

On April 14, 2026, InterDigital filed in this action a Motion to Dismiss for lack of jurisdiction, which the Court denied on May 20, 2026. (Dkt. Nos. 27, 44). On August 1, 2026, InterDigital filed an Answer to Dolby's Complaint, raising Affirmative Defenses and Counterclaims against Dolby ("Counterclaims"). (Dkt. No. 53). In it, InterDigital reiterates its arguments that this Court does not have jurisdiction and premises its counterclaim against Dolby:

> "InterDigital has not accused Dolby of any type of infringement, including any type of indirect infringement. . . Nonetheless, Dolby has stated its actions create a risk of it being accused of indirect infringement (not direct infringement). In reliance on those statements, for its conditional counterclaim concerning indirect infringement, InterDigital assumes that Dolby could infringe and conditionally alleges that Dolby may be an indirect infringer based on direct infringement by Disney."

(*Id* ¶ 73). InterDigital then raises three conditional counterclaims: (1) that Dolby indirectly infringed, via inducing or contributing to Disney's direct infringement,

InterDigital's '268 Patent; (2) that Disney directly infringed its '268 Patent ("Second Counterclaim"); and (3) that the '268 Patent is valid ("Third Counterclaim"). (Counterclaims ¶¶ 74-100).

On July 13, 2026, Dolby filed the instant Motion to Dismiss all InterDigital's counterclaims. (Mot. at 1). On August 7, 2026, InterDigital filed its Opposition ("Opposition"), (Dkt. No. 66), and on August 21, 2026, Dolby filed its Reply ("Reply"), (Dkt. No. 67).

On September 23, 2026, InterDigital filed a Notice of Supplemental Authority ("Notice of Suppl. Auth.") attaching Dolby's September 15, 2026, discovery responses. (Notice of Suppl. Auth., Dkt. No. 80). InterDigital argues that "Dolby's response to Interrogatory No. 2 and its accompanying Attachment A" is "relevant to whether InterDigital's Second Counterclaim should be dismissed." (*Id.* at 2). InterDigital appears to refer to the following portion of Dolby's interrogatory response:

> As explained in Attachment A, InterDigital has failed to allege that (1) Dolby infringes (directly or indirectly) claims 12-30 of the '268 patent, (2) Dolby directly infringes claims 1-11 of the '268 patent, or (3) Dolby indirectly infringes any claim of the '268 patent based on direct infringement by a party other than Disney.

(Dkt. No. 81 at 13-14). InterDigital also filed an Application to file the "Attachment A" referenced in Dolby's response to Interrogatory No. 2 under seal, (Application to File Ex. 2 Under Seal), since the attachment contains protected material subject to the parties' Standing Protective Order, (Dkt. No. 75).[1]

The Court heard oral argument from the parties on September 25, 2026, where both parties presented slideshows and provided the Court with copies of their slides. (Dkt. No. 86). Following oral argument, on October 2, 2026, InterDigital filed

---

[1] Both discovery documents that InterDigital references in its Notice of Supplemental Authority contain extensive discourse by Dolby regarding its opinion on the merits of this case. The Court only references InterDigital's Notice of Supplemental Authority and its attachments to resolve InterDigital's confusion about the procedural framework *in general*.

another Application to file under seal, attaching their slides used during oral argument. (Application to File Ex. B Under Seal). On October 6, 2026, Dolby filed a Request for Judicial Notice attaching a submission from the '268 Patent's prosecution history that Dolby's counsel "referenced" during oral argument "in addressing whether the asserted claims 1 and 6 are representative." (RJN at 1).

## II. LEGAL STANDARD

### A. Patent Eligibility

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a '268 Patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. Abstract ideas are not patent eligible. *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018); *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014) ("The abstract ideas category embodies the longstanding rule that an idea of itself is not '268 Patentable.") (cleaned up).

Courts determine if a claim's subject matter is '268 Patent eligible by applying a two-step framework, articulated by the Supreme Court in *Alice. Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1367 (Fed. Cir. 2024), *cert. denied*, No. 24-827, 2025 WL 1151241 (U.S. Apr. 21, 2025). In the first step, courts determine if the claims at issue are "directed to" an abstract idea. *Id.* In doing so, courts look to the claims' language itself and "may also examine the patent's specification to determine the meaning of the claims as a whole." *Id.* If claims are not directed to an abstract idea, the inquiry ends. *See Enfish, LLC v. Microsoft Corp.,* 822 F.3d 1327, 1339 (Fed. Cir. 2016) (explaining that because the claims were not directed to an abstract idea, the court need not reach *Alice* step two).

If a court determines that claims are directed to an abstract idea, the court determines if the claims contain an "'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Core Wireless*, 880 F.3d at

1361. A "transformation into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Simio, LLC v. FlexSim Software Prods.*, Inc., 983 F.3d 1353, 1363 (Fed. Cir. 2020) (citing *Alice*, 573 U.S. at 217). Instead, there must be "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent on the abstract idea itself." *Id.*

**B. Resolving Patent Eligibility on a Motion to Dismiss**

"[W]hether a claim recites patent eligible subject matter is a question of law which may contain underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). A court may determine patent eligibility on a motion to dismiss when "there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1355 (Fed. Cir. 2024). Accordingly, to survive a motion dismiss regarding patent eligibility, the complaint, underlying patent or matters subject to judicial notice must raise a question of fact regarding the patent's eligibility. *Broadcom Corp. v. Netflix Inc.*, 677 F. Supp. 3d 1010, 1018 (N.D. Cal. 2023).

**C. Representativeness**

Subject matter eligibility is determined at a claim level; eligibility findings extend to the challenged claim and any other claim for which the challenged claim is representative. *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1291 (Fed. Cir. 2024) (quoting *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017)). "The patent challenger who identifies a claim as representative of a group of claims bears the initial burden to make a prima facie showing that the group of claims are 'substantially similar and linked to the same' ineligible concept." *Id.* at 1290. Once the challenger meets the initial burden, the "burden shifts to the patent owner to present non-frivolous arguments as to why the eligibility of the identified representative claim cannot fairly be treated as decisive of

the eligibility of all claims in the group." *Id.* If the patent owner presents a non-frivolous argument, the patent challenger then:

> bears the burden to prove either that (i) the representative claim is, in fact, representative, in that any differences among the claims are not material to the eligibility analysis (i.e., the claims are substantially similar and are linked to the same ineligible concept); or (ii) each separate claim (i.e., those not fairly represented by the purported representative claim) is ineligible for patenting.

*Id.* at 1291. This approach is mandated by the longstanding principle that "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims." 35 U.S.C. § 282; *see also Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 n.9 (Fed. Cir. 2016) ("Addressing each of the asserted claims is unnecessary when all the claims are substantially similar and linked to the same abstract idea.") (internal quotation marks omitted).

**D. Application for Leave to File Under Seal**

"[T]he strong presumption of access to judicial records applies fully to dispositive pleadings," such as a motion to dismiss. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). The "mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.* (cleaned up). Ultimately, "[w]hat constitutes a compelling reason" is "left to the sound discretion of the trial court." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (cleaned up). Parties requesting sealing by this Court must comply with the Central District of California's Local Rule 79-5.2.2. *See* L.R. 79-5.2.2. Local Rule 79.5.2.2(b) requires that a party seeking to file a document under seal that contains information previously designated confidential by another party pursuant to a protective order must confer with that party; and (2) *attempt to eliminate or minimize the need for filing under seal by means of redaction*. L. R. 79-5.2.2(b)

(emphasis added). "If the document cannot be suitably redacted by agreement, the Filing Party may file an Application [to seal], but the supporting declaration must identify the material previously designated as confidential . . . and *must describe in detail the efforts made to resolve the issue*. *Id.* (emphasis added). "Failure to file a declaration or other required document may be deemed sufficient grounds for denying the Application." L.R. 79-5.2.2(b)(1).

**E. Request for Judicial Notice**

Judicial notice is only appropriate when the Court is taking notice of undisputed matters of public records from sources whose accuracy cannot be reasonably disputed. *Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001); Federal Rule of Evidence 201(b). A court may deny a request for judicial notice if the request is for irrelevant documents. *See Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1298 n.6 (9th Cir. 2015) (denying "two requests for judicial notice on the grounds that the documents to be noticed are irrelevant"); Ruiz v. City of Santa Maria, 160 F.3d 543, 548 n.13 (9th Cir.1998) (denying request for judicial notice, in part because information to be noticed did not bear on the "relevant issue" before the court).

**III. REPRESENTATIVE CLAIMS**

Dolby argues that Claim 6 is representative of all claims in the '268 Patent, (Mot. at 16), but, even if it is not, that all of the '268 Patent's Claims are invalid for lack of patent eligibility. InterDigital opposes Dolby's representativeness argument, arguing that at the very least, Claim 1 of the '268 Patent "recites a different method entirely" from Claim 6, and pointing to the fact that "Claim 6 creates *two* related masters; but Claim 1 creates "only" the non-reference master and generates metadata instructions for translating the master's colors for view on the reference display." (Opp. At 14). InterDigital classifies the remaining claims of the '268 Patent as being "dependent" on either Claim 1 or Claim 6, in that these dependent claims do not introduce a new method but rather just introduce limitations and alterations to either

Claim 1 or 6. (*Id.*) Dolby's Reply argues that even if Claim 1 is representative of a distinct group of claims from Claim 6, both claims are too abstract to be patentable. (Reply at 9).

The Court finds Dolby met its initial burden, but that InterDigital advanced sufficiently non-frivolous arguments that Claim 1 and Claim 6 cannot be fairly treated as linked to the same concept. Because InterDigital has not shown that the '268 Patent's remaining claims deserve separate treatment from Claims 1 and 6, the Court finds that InterDigital has only met its burden to treat Claims 1 and 6 as representative of the other claims in the '268 Patent. Thus, Dolby bears the burden to show that Claims 1 and 6 are "linked to the same ineligible concept," or that "each separate claim . . . is ineligible for patenting." *Mobile Acuity Ltd.,* 110 F.4th at 1291. For its own analysis, the Court treats Claims 1 and 6 as representative of the other claims in the '268 Patent.

## IV. DOLBY'S REQUEST FOR JUDICIAL NOTICE

Dolby requests that the Court take judicial notice of a submission during the '268 Patent's prosecution history that it claims are relevant to the Court's determination of which of the '268 Patent's claims are representative of the others. RJN at 1. "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents . . . were in fact true.'" Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir. 2010). While the '268 Patent's prosecution history is properly subject to judicial notice, it appears that Dolby seeks to use the contents of a submission in the patent prosecution to bolster its argument that only Claim 6 is representative of the '268 Patent's claims. The truth of the statements in the submission is not the proper subject of judicial notice. Furthermore, as described above in part III, *supra*, Dolby has already met its "initial burden to make a prima facie showing that the group of claims are substantially similar and linked to the same ineligible concept," and InterDigital has also already met its burden to present "non-frivolous arguments as to

why the eligibility of the identified representative claim cannot fairly be treated as decisive of the eligibility of all claims in the group." *Mobile Acuity Ltd.*, 110 F.4th at 1291. The only remaining question is whether Dolby can demonstrate both Claim 1 and 6 are directed to the same abstract idea or whether Dolby can demonstrate that Claim 1 and 6 independently are directed to abstract ideas. *Id.* The patent prosecution history submission in Dolby's RJN has no bearing on whether the Claims 1 and 6 are directed to the same abstract idea. Thus, the Court **DENIES** Dolby's RJN.

## V. VALIDITY OF THE '268 PATENT

On November 10, 2015, the United States Patent and Trademark Office issued the '268 Patent, titled "Methods and Systems for Displays with Chromatic Correction with Differing Chromatic Ranges." (Compl. ¶ 30). A copy of the '268 Patent is attached to the Complaint at Exhibit 1. ('268 Patent, Dkt. No. 1-1).

Dolby argues that the claims in the '268 Patent are directed to the abstract idea of converting content from one format to another and do not include an inventive concept. (Mot. at 7). Representative claim 1 of the '268 Patent recites:

> 1. A method for color correcting, comprising:
> performing color correction on source picture content,
> using at least one of a non-reference type display having a non-reference color gamut and a reference type display having a reference color gamut,
> wherein said performing step comprises:
> mastering the Source picture content to provide mastered color corrected picture content for display on the non reference type displays having a non-reference color gamut; and
> generating metadata for a color gamut mapping that color transforms the mastered color corrected picture content for display on reference type displays having a reference color gamut,
> wherein the source picture content is mastered only for the non-reference type displays having the non-reference color gamut.

('268 Patent at 12:23-39). Representative claim 6 of the '268 Patent recites:

6. A method for color correcting, comprising:
performing color correction on source picture content,
using at least one of a non-reference type display having a non-reference color gamut and a reference type display having a reference color gamut,
wherein said performing step comprises:
mastering the Source picture content to provide mastered color corrected picture content for display on the non-reference type displays having a non-reference color gamut, and
mastering the source picture content to provide mastered color corrected picture content for display on the reference type displays having a reference color gamut,
using a color gamut mapping applied to the mastered color corrected picture content for display on the non-reference type displays having the non-reference color gamut.

('268 Patent at 12:58-13:7).

### A. *Alice* Step One

At *Alice* Step One, we examine the '268 Patent's "'claimed advance' to determine whether the claims are directed to an abstract idea." *Finjan, Inc. v. Blue Coat System, Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018). "In cases involving software innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Id.* (quoting *Enfish*, 822 F.3d at 1335–36); *see BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1285–86 (Fed. Cir. 2018). Computers are improved not only through changes in hardware; "[s]oftware can make non-abstract improvements to computer technology . . . ." *Enfish*, 822 F.3d at 1335; *see Finjan*, 879 F.3d at 1304. The Federal Circuit regularly holds claims to pass muster under *Alice* step one when sufficiently focused on such improvements. *See, e.g.*, *Enfish,* 822 F.3d at 1339; *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1347 (Fed. Cir. 2018), *as*

*amended* (Nov. 20, 2018); *PowerBlock Holdings, Inc. v. iFit, Inc.*, 146 F.4th 1366, 1373 (Fed. Cir. 2025).

In assessing whether a '268 Patent's claims are directed to an abstract idea, it is sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases. *See Alice*, 573 U.S. at 221 ("[The Court] need not labor to delimit the precise contours of the 'abstract ideas' category in this case. It is enough to recognize that there is no meaningful distinction between the concept of risk hedging in *Bilski* and the concept of intermediated settlement at issue here"); *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed.Cir.2015). For instance, fundamental economic and conventional business practices are often found to be abstract ideas, even if performed on a computer. *See, e.g., OIP Techs.,* 788 F.3d at 1362–63.

In *Enfish*, the Federal Circuit held that the patent claims at issue were not directed to an abstract idea because the claimed self-referential tables improved the way that computers operated and handled data by allowing the more efficient launching and adaptation of databases. *Enfish*, 822 F.3d at 1333, 1336; *see BSG Tech LLC v. Buyseasons, Inc.,* 899 F.3d 1281, 1288 (Fed. Cir. 2018) (noting that the self-referential table in *Enfish* "enabled programmers to construct databases in new ways that required less modeling and configuring of various tables prior to launch").

In *Visual Memory LLC v. NVIDIA Corp.*, the Federal Circuit drew a similar conclusion about claims focused on a specific improvement in computer memory. 867 F.3d 1253, 1262 (Fed. Cir. 2017). The district court had determined that the claims were directed to the abstract concept of categorical data storage. *Id*. at 1257. The Federal Circuit determined that the district court had erred because the '268 Patent was specifically "directed to an improved computer memory system, not to the abstract idea of categorical data storage," and therefore was not directed to an abstract idea. *Id*. at 1259. The claims were specific and limited to certain types of data to be stored. *Id*. "None of the claims recite[d] all types and all forms of categorical data

storage." *Id*. As the Federal Circuit summarized in *BSG*, the *Visual Memory* claims were directed to "an 'improved memory system' that configured operational characteristics of a computer's cache memory based on the type of processor connected to the memory system," allowing "the claimed invention to accommodate different types of processors without compromising performance." 899 F.3d at 1288. This was an improvement in computer functionality. *Visual Memory*, 867 F.3d at 1260.

In *Finjan*, the Federal Circuit held that claims to a "behavior-based virus scan" were a specific improvement in computer functionality and hence not directed to an abstract idea. 879 F.3d at 1304. The claimed technique of scanning enabled "more flexible and nuanced virus filtering" and detection of potentially dangerous code. *Id*. The claims thus were directed to "a non-abstract improvement in computer functionality" having the benefit of achieving greater computer security. *Id*. at 1305.

In *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, the Federal Circuit held that claims to a method for making websites easier to navigate on a small-screen device were not directed to an abstract idea. 880 F.3d 1356, 1363 (Fed. Cir. 2018). The claimed method involved launching a summary window to allow small-screen users to quickly access commonly used features of a website. *Id*. at 1359–60. Although the defendant argued that the patent was directed to the abstract idea of indexing information, the Federal Circuit determined that the claims were directed to a specific type of index for a specific type of user and so not directed to an abstract idea. *Id*. at 1362–63.

Most recently, in *Data Engine Technologies LLC v. Google LLC*, the Federal Circuit held that claims to "a specific method for navigating through three-dimensional electronic spreadsheets" were "not directed to an abstract idea." 906 F.3d 999, 1007 (Fed. Cir. 2018). The method provided "a specific solution to then-existing technological problems in computers and prior art electronic spreadsheets." *Id*. at 1008. The navigation difficulties of prior-art spreadsheets were addressed "in a

particular way—by providing a highly intuitive, user-friendly interface with familiar notebook tabs for navigating the three-dimensional worksheet environment." *Id.* The Court distinguished other cases in which it had held claims to be "simply directed to displaying a graphical user interface or collecting, manipulating, or organizing information"; the claims in *Data Engine*, by contrast, recite "a specific structure (i.e., notebook tabs) within a particular spreadsheet display that performs a specific function (i.e., navigating within a three-dimensional spreadsheet)." *Id.* at 1010–11.

In accordance with those precedents, Claims 1 and 6 of the InterDigital's '268 Patent are not directed to an abstract idea. Improving the efficiency and fidelity of displaying motion picture colors across consumer and studio screens can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem. *See Finjan*, 879 F.3d at 1304–05. The claimed method here specifically identifies how that functionality improvement is effectuated in an assertedly unexpected way.

Traditionally, content creators would manually tweak, or color-correct, a raw motion picture until it looked perfect on a studio screen, save the final motion picture as a "master" copy, and then release this master copy for distribution. ('268 Patent at 1:15-23). However, for a variety of reasons, directly attempting to display this studio-graded master on a consumer screen often "look[s] dissatisfying." (*Id.* at 1:26-29). One common reason is that even when the consumer screen has the same color gamut, or range of displayable colors, as the studio screen, the consumer screen may create its different colors through different combinations of the consumer screen's color channels, or primaries, than the studio screen. (*Id.* at 1:31-36). The '268 Patent explains that because consumer displays may have primaries with the same name as the studio display's primaries (for example, red, green, etc.), the hues of these primaries may not be aligned with the studio's primaries (for example, the studio display's red color channel may have a different hue than the consumer display's red), and as a result, "tomatoes look like oranges, and so forth." (*Id.* at 3:1-12). Because it

is complex and expensive for consumer screens to determine what adjustment would need to be made to display the master according to its intended hue, many consumer displays simply accept the color inaccuracy. (*Id.*).

Another common reason that a consumer screen displaying a studio-graded master may fail to resemble the intended result is because studio screens often have "wide gamut color displays," where the studio screen can display colors and hues that the consumer display has no technological capability to display. (*Id.* at 1:37-44). In such cases, consumer displays typically "clip[s]" the studio master's unsupported color to the "maximum ranges" that the consumer display's primaries can produce, causing "wrong color reproduction, in a hue, saturation, and also brightness error." (*Id.* at 3:21-35). To combat this unideal status quo, Claims 1 and 6 of the '268 Patent describes assertedly new methods of color correcting a master and packaging the master for distribution.

In Claim 1, the '268 Patent describes the method as follows: first, instead of optimizing the colors to create a master for display on a studio screen, manually optimize the colors to create a master for display on a consumer screen. (*Id*. at 12:23-32). Then, without actually modifying the colors of the master, conduct the exercise of color correcting the consumer-optimized master and converting it into a studio-optimized copy, and retain the data for each color correction necessary to convert the consumer-optimized master into a studio-optimized copy. (*Id*. at 12:33-39). Finally, instead of distributing a master optimized for studio displays that consumers displays will struggle with, the content creator distributes the consumer-optimized master alongside the data that a studio display could use to quickly and inexpensively translate the consumer-optimized master for display on a studio screen. (*Id*. at 12:37-39; *Id*. Figs. 5, 7). Thus, the distribution of a consumer-optimized master alongside the data allows content receivers to either immediately display the master if the receiver is a consumer screen, or apply the mapping to the master if the receiver is a

studio screen, saving both the consumer and studio screen receivers from attempting to deduce an accurate color mapping from scratch. (*Id*. at 10:50-58).

Claim 6 of the '268 Patent shares the same first step as Claim 1 and requires the creation of a master for display on a consumer screen. (*Id*. at 12:58-67). However, it differs from Claim 1 in that at the second step, it instructs the creation of a second master. Specifically, Claim 6 requires that the content creator retains a copy of the consumer-optimized master and then conduct the exercise of color correcting the consumer-optimized master for studio display, resulting in two masters: one for the consumer screen and one for the studio screen that is derivative from the consumer screen master. (*Id*. 13:1-7, 11:1-5). Thus, the distribution of both masters allows content receivers to immediately display either the consumer-optimized master or the studio-optimized master. (*Id*.; *id*. at Figs. 6, 8).

One of the "real benefit[s]" to the '268 Patent's representative methods is that they ensure that the issue with wide-gamut studio displays is avoided, as starting the color correction from the consumer display and converting to the wide-gamut display (which can display beyond the consumer color gamut) avoids the status quo where a color chosen when creating a wide-gamut-optimized master from the raw source content is impossible to attain in a consumer display. (*Id*. at 10:9-12). Furthermore, executing Claims 1 and 6 from the content creation side ensures that content creators can rest assured that there will be no surprise colors on display on a consumer screen. (*Id*. at 1:11-14).

Dolby claims that the fact that the '268 Patent "recites a relationship between formats and an order for creating the formats, [but] the same is true for any claim directed to the abstract idea of converting between formats. Format conversion necessarily involves an input format, and output format, and a conversion between the two. . . the claim recites nothing about 'how' the conversion is performed." (Mot. at 2-3) (internal citations omitted) (emphasis in original). Yet, the '268 Patent's claims do not just specify that any input, any output, and any order in which the color gamut

mappings would occur. The patent specifically supplies a configuration for the functional operations of the color gamut mapping that they allege allowed the more predictable and efficient display of motion pictures, with specific limitations as to which types of masters were to be created and then converted. This configuration is "how" the conversion is performed, and therefore the claim is specifically directed to a non-abstract concept. This is directly in line with *Visual Memory* in which the claims were directed at "configur[ing] operational characteristics of a computer's cache memory based on the type of processor connected to the memory system," allowing "the claimed invention to accommodate different types of processors without compromising performance." *BSG*, 899 F.3d at 1288 (summarizing the holding in *Visual Memory*, 867 F. 3d at 1262). Analogously, Claims 1 and 6 "configure operational characteristics of" the motion picture mastering and content distribution process, allowing "the claimed invention to accommodate" consumer display color gamuts "without compromising performance" of studio displays.[2] *See also Core*

---

[2] At oral argument, Dolby argued that because Claims 1 and 6 do not describe which of the infinite options for color gamut mapping should occur at the second step of the claimed methods, the claims lack the necessary specificity for patent-eligibility. Dolby emphasized that the Court's determination of the claimed method's validity must not rely on technical details in the specification, citing *ChargePoint, Inc. v. SemaConnect, Inc.* 920 F.3d 759, 769 (Fed. Cir. 2019) ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims"). Though the language in Claims 1 and 6 indeed do not explicitly specify which color gamut mapping between the Claims' consumer-graded master created at step one and the studio-graded output at step two (either metadata or a second master), it is clear when reading the claims in *context* of their specification that the Claims require the studio-graded output to be at least broadly consistent with the color rendering in the consumer-graded master. The Court need not ignore the '268 Patent's specifications when considering the claims. *See GoTV Streaming LLC v. Netflix, Inc.*, 166 F.4th 1053, 1061 (Fed. Cir. 2026) ("[a patent's] specification's (and prosecution history's) recitation of the problem faced and the asserted inventive solution informs the inquiry into what the combination of claimed features is directed to") (citing *ChargePoint* 920 F.3d at 767-68). The '268 Patent's specification is not full of technical detail that the claims require to gain the alleged benefit. This distinguishes the '268 Patent from the line of cases cited by Dolby at oral argument. In *AI Visualize, Inc. v. Nuance Communications, Inc.*, for example, the Federal Circuit held that a patentee's identification of "multiple passages of the

*Wireless*, 880 F.3d 1363 (holding that a patent directed to configuring a specific type of index for a specific type of user to make websites easier to navigate on a small-screen device was not directed to an abstract idea); *Data Engine Technologies*, 906 F.3d at 1010-11 (finding the claims were validly directed at “a specific structure (i.e., notebook tabs) within a particular spreadsheet display that performs a specific function (i.e., navigating within a three-dimensional spreadsheet)”). In short, Claims 1 and 6 are directed to a solution to a color-rendering incompatibility problem for consumer screens, with “the specificity required to transform [the] claim from one claiming only a result to one claiming a way of achieving it.” *SAP America, Inc.*, 898 F.3d at 1167. It therefore passes muster under *Alice* step one, as it is not directed to ‘268 Patent-ineligible subject matter.

Because the ‘268 Patent’s representative claims pass muster under *Alice* step one, this Court need not and does not apply step two of the *Alice* analysis. *See Data*

---

specification” for details as to how to create “on the fly” virtual views, “including one passage that addresses dynamic and static virtual views by describing how related image frames are selected,” could not be used to prove that its claims provided a technical solution to a technical problem. 97 F.4th 1371 1379 (Fed. Cir. 2024). Similarly, in *Hawk Technology Systems, LLC v. Castle Retail*, also cited by Dolby in oral argument, the Federal Circuit found that the patent’s claims “do not disclose performing any ‘special data conversion’ or otherwise describe how the alleged goal of ‘conserving bandwidth while preserving data’ is achieved. Nor . . . do the claims (or the specification) explain what the claimed parameters are or how they should be manipulated.” 60 F.4th 1349, 1357 (Fed. Cir. 2023). Here, the specification of the ‘268 Patent alleges that the benefit of the claimed methods occurs regardless of which color gamut mapping process or parameters are selected at its step two, as long as the color gamut mapping process creates a studio-graded master or metadata from a consumer-graded master that broadly preserves the fidelity of the motion picture content (i.e., so that “tomatoes [do not] look like oranges”). (‘268 Patent at 3:9-10). The fact that many approaches to color gamut mapping exist (for example, at oral argument, Dolby explained that a method for color gamut mapping could select a color palette resulting in a “moodier” version of a motion picture) does not affect the claimed benefit. As long as the color gamut mapping at step two allows pictured objects to remain identifiable, the intended benefit of Claims 1 and 6 is achieved. Thus, the fact that the color gamut mapping must retain identifiability of the displayed objects is a basic assumption, not a technical implementation detail raised only in the specifications that is required to enjoy the alleged benefit of the claims.

*Engine*, 906 F.3d at 1011; *Finjan*, 879 F.3d at 1306; *Visual* Memory, 867 F.3d at 1262. Nevertheless, the Court notes that given the overlaps between some *Alice* step one and step two considerations, *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016), this Court's conclusion that the specific improvement in this case passes muster at step one is also indirectly reinforced by some of the Federal Circuit's holdings under step two.[3]

---

[3] For example, in *BASCOM Global Internet Services v. AT&T Mobility*, the Federal Circuit held that claims to a method and system of filtering Internet content using an Internet Service Provider (ISP) server were a "technical improvement over the prior art ways of filtering such content." 827 F.3d 1341, 1350, 1352 (Fed. Cir. 2016). The prior art disclosed two forms of content-filtering systems: software was either (1) "placed on local computers, such that each local computer had its own tool for filtering [content]"; or (2) placed on "a local server" or remote ISP server. *Id.* at 1343-44. But both of those systems had disadvantages: the former allowed end-user modifications and was difficult to administer; the latter ignored material differences among end users. *Id*. The claimed invention addressed the disadvantages of the prior art through a filtering system located on an ISP server that used the server's ability to "to associate an individual user with a specific request" to create individually customizable filtering. *Id*. In holding the claimed invention eligible under *Alice* step two, the Federal Circuit reasoned that although "[f]iltering content on the Internet was already a known concept, . . . the '268 Patent describes how its particular arrangement of elements is a technical improvement over the prior art ways of filtering such content." *Id*. at 1349-50. A similar characterization applies to the improvement claimed in this case: though color gamut mapping and conversion between studio-optimized content and consumer-optimized content was already a known concept, (*see* Reply at 2), the '268 Patent describes how its particular arrangement of steps, inputs and outputs is "a technical improvement over the prior art ways." *BASCOM,* 827 F.3d at 1350. The contrast with another step-two case, *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016), is also instructive. There, one claimed invention required the installation of virus screening software on a telephone network. *Id*. at 1319. But because the claim at issue did not "recite[ ] any improvement to conventional virus screening software, nor . . . solve any problem associated with situating such virus screening on the telephone network," the Federal Circuit held that the patent did not identify a sufficient inventive concept under *Alice* to transform the claimed abstract idea into something patentable. *Id*. at 1320–21. Nor did the claimed method provide advantages with respect to computer function. *Id*. at 1320. By contrast, in the present case, the '268 Patent explains that the claimed invention unintuitively flips the order of operations and alters how the color mapping function is performed (in that any color gamut mapping to create studio-optimized content must apply the mapping to the consumer-optimized master and not the source picture content), yielding a tangible technological benefit (by making the distributed content easier for content receivers and therefore more predictable for content distributors, and by avoiding wide-gamut studio display colors that

Dolby does not dispute that all claims pass muster if Claims 1 and 6 do. Accordingly, the Court holds that Dolby has not shown the ‘268 Patent’s claims to be invalid under 35 U.S.C. § 101. The Motion to Dismiss all of InterDigital’s counterclaims for invalidity of the ‘268 Patent is **DENIED**.

## VI. INTERDIGITAL’S SECOND COUNTERCLAIM

InterDigital’s Second Counterclaim improperly levies claims against nonparty Disney in what appears to be an effort to circumvent the stay in the Disney Action. Though InterDigital may rely on Disney’s alleged conduct to satisfy the direct infringement *element* of its indirect infringement claim against Dolby, it may not seek relief from Disney in this action. Non-party Disney has agreed to be bound by the outcome of this action with respect to infringement and validity of the ‘268 Patent, but any claim for relief from Disney must proceed in the Disney Action. (*See* Disney Action, Order RE Defendants’ Motion to Stay Pending Resolution of Related Proceedings at 6).

At oral argument, InterDigital cited *Glenayre Elecs., Inc. v. Jackson,* 443 F.3d 851, 858-59 (Fed. Cir. 2006), to claim that their Second Counterclaim in this case is required, as a matter of law, to successfully claim that Dolby indirectly infringed their patent. *Glenayre Elecs*. does not stand for that proposition. “A party that induces or contributes to infringement is jointly and severally liable with the direct infringer for all general damages.” *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001). *Glenayre Elecs.* simply instructs that a patentee whose damages award against an indirect infringer “was calculated to fully compensate [the patentee] for all rights in the patent” cannot subsequently sue “[the indirect infringer]’s customers to hold them liable for their extant infringement in order to collect full compensation.” *Glenayre Elecs.*, 443 F.3d at 871. Thus, *Glenayre Elecs. confirms* that InterDigital may recover fully from Dolby in this action

---

are impossible to replicate in consumer displays). Thus, *Intellectual Ventures* is consistent with our conclusion.

from any alleged infringement of the ‘268 Patent resulting from use of Dolby Vision as instructed (i.e., out-the-box use) by Disney or other customers.[4, 5]

Importantly, the Federal Circuit also left undisturbed that district court’s decisions to stay the counterclaims against the manufacturer plaintiff’s customers pending the verdict as to plaintiff *and* to deny a further trial on the counterclaims against the customers because the judgment against plaintiff had made patentee whole. Thus, *Glenayre Elecs.* supports this Court’s handling of both cases here, rather than undermines it.[6]

InterDigital’s submission of Dolby’s discovery responses as a Notice of Supplemental Authority and Applications to File Under Seal thus have no bearing on the viability of InterDigital’s counterclaims. Dolby’s discovery response attached to InterDigital’s Notice of Supplemental Authority appears to state Dolby’s position as

---

[4] Dolby has previously stated that it will comply with its contractual indemnity obligations for Disney’s use of Dolby Vision. (*See* Compl. ¶ 25; Dkt. 33 at 12-14).

[5] At oral argument, InterDigital expressed its worry that a finding of non-infringement of the ‘268 Patent by Dolby Vision in the Dolby Action would preclude InterDigital from, for example, recovering from Disney for any *specialized implementation* of Dolby Vision that may infringe the ‘268 Patent. This worry is unfounded. First, as Dolby has repeatedly pointed out, if the use of Dolby Vision as instructed directly infringes the ‘268 Patent, Dolby has indirectly infringed the ‘268 Patent. (Dkt. No. 33 at 18); *see Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014). Furthermore, Dolby has alleged that InterDigital accuses Disney of infringing the ‘268 Patent by using Dolby Vision, attributes every infringed claim element of its ‘268 Patent to Dolby Vision and identifies no substantial non-infringing use for Dolby Vision. (Compl. ¶¶ 23-24). Finally, even if this Dolby Action does result in a finding of Dolby Vision’s non-infringement, but InterDigital nonetheless believes it can demonstrate that Disney implemented Dolby Vision in a special way that infringes the ‘268 Patent, an allegation *not currently made* in the Disney Action, InterDigital may request leave to amend its Complaint in the Disney Action as needed to argue that issue preclusion does not apply. Regardless, InterDigital has not presented the Court with a motion to consolidate the cases; it cannot raise a *claim* against Disney in the Dolby Action absent Disney’s presence as a party.

[6] InterDigital has failed to support its claim that this Court is committing legal error by allowing Dolby to proceed with this case; on the contrary, counsel’s material overstatement of the holding in *Glenayre Elecs.* at oral argument does more to undermine counsel’s credibility than advance InterDigital’s interests.

to what InterDigital's counterclaims do not allege; if InterDigital has issue with what its counterclaims do not allege, that is irrelevant here. This Court need not review any of InterDigital's supplied materials in its Notice of Supplemental Authority or its Applications to File Under Seal in order to decide that InterDigital's Second Counterclaim should be dismissed and its requested relief from non-party Disney should be stricken. The Court **DISMISSES** InterDigital's Second Counterclaim with prejudice and **STRIKES** its sought relief.

## VII. INTERDIGITAL'S THIRD COUNTERCLAIM

InterDigital's Third Counterclaim requesting a declaratory judgment that their '268 Patent is valid is improper under 35 U.S.C. § 282, as patents are presumed valid when issued. *See Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1569 (Fed. Cir. 1987) ("It is neither necessary nor appropriate for a court to declare a patent valid."); *Environmental Designs, Ltd. v. Union Oil Company of California,* 713 F.2d 693, 699 n. 9 (Fed.Cir.1983).

Dolby's Motion to Dismiss InterDigital's Third Counterclaim is also unopposed. Because the InterDigital does not oppose the dismissal of the Third Counterclaim, its merits are conceded. *See* C.D. Cal. L.R. 7-9 (setting forth the requirement of opposition brief or statement of non-opposition). Dolby submits a declaration under penalty of perjury that during the meet-and-confer process, InterDigital acknowledged the defect of its Third Counterclaim and "advised Dolby that it does not oppose dismissal of this counterclaim." (Reply at 21-22). As such, the Court **DISMISSES** InterDigital's Third Counterclaim with prejudice.

## VIII. INTERDIGITAL'S APPLICATIONS TO FILE UNDER SEAL

InterDigital's Applications to File Under Seal do not comply with Local Rule 79.5.2.2(b) requiring the relevant parties to meet and confer and "*attempt to eliminate or minimize the need for filing under seal by means of redaction*." L. R. 79-5.2.2(b) (emphasis added). Specifically, both InterDigital's Applications to File Under Seal request to seal entire lengthy exhibits and fail to include any supporting declarations

that "describe in detail the efforts made to resolve the issue" or otherwise minimize the need for filing under seal. *Id.* As such, the Court **DENIES** InterDigital's Applications to File Under Seal.

## IX. CONCLUSION

For the foregoing reasons the Court **DENIES** the Motion to Dismiss as to the '268 Patent; **GRANTS** the Motion to Dismiss InterDigital's Second Counterclaim and **STRIKES** InterDigital's associated requests for relief pursuant to the Second Counterclaim; **GRANTS** the Motion to Dismiss InterDigital's Third Counterclaim; **DENIES** InterDigital's Applications to File Under Seal; and **DENIES** Dolby's Request for Judicial Notice.

**IT IS SO ORDERED.**

Dated: October 8, 2026

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE